In re: TATARINOV v. SUPERIOR COURT
Case No.: 07cv2034JAH(POR)

## Index of Exhibits in Support of Motion for Stay

A. Declaration of Petitioner's wife, Patricia Lynn Jacks ................................. 1 - 2

B. Progress Summary Regarding Petitioner's Health Issues ......................... 3 - 4

C. Letter from Attorney Jerome Wallingford .................................................... 5 - 6

D. Letter from Roy Resnikoff, M.D. ..................................................................... 7

07CV2034 JAH POR

## Declaration of Patricia Lynn Jacks-Tatarinov

This is the most difficult letter I have ever written and I don't even know where to begin. I am appealing to your sense of justice and compassion in regards to my husband, Dmitri Vallerveich Tatarinov. I need to convince you to give my husband another chance. He has been ordered deported for crimes of moral turpitude (misdemeanor theft, 1996, and robbery, 1998.).

I am an Untied States Citizen by virtue of my birth in Detroit, Michigan and have resided in the United States my entire life. I am a Certified Public Accountant and an Attorney. In addition to holding a Bachelors Degree and I hold a Master of Science Degree in Accountancy.

Dmitri and I are now facing consequences which will be with both of us for the rest of our lives due to his behavior. If Dmitri is not allowed to remain in the United States, I do not know what will become of us. Yes, it is melodramatic, but it's true. Dmitri's immigration status has caused us both a considerable amount of stress. First if all, from talking with Dmitri, I believe that he cannot return to Russia. Dmitri's life would be in danger. We would have to try and find another country to relocate to and find employment. Needless to say this would be extremely difficult for us. I have never lived outside the Untied States. Additionally, my mother is 78 years old and I wouldn't feel comfortable leaving the country and her at this stage of her life. Our goals and our future are here. Dmitri is my best friend, this is the man I waited to marry and meet until I was 35 years old. I am asking for your help in solving this difficult situation. I'm a little old fashioned as I believe in marriage for life. Dmitri is my husband for the rest of my life, through the bad times and the good times. My first thought every morning is how are we going to clean up this deportation problem - please don't let him be deported.

Before I go further in this letter, I know that all you know about my husband are the dry facts relating to his criminal convictions. Even though he has these criminal convictions I believe he has a high set of moral values. There are sides to my husband that his behavior did not show and I would like to share them with you so that you will know my husband a little better.

Dmitri and I met in the summer of 1993. We were both employed at The Floral Emporium. My first impression of Dmitri was that he had a beautiful smile. After further conversations I learned that he was extremely polite and somewhat shy, not forward at all. After leaving the shop where we worked together, Dmitri started his own boat maintenance business for out of town boat owners. While working on the boats, Dmitri came up with a new product idea which he had trademarked and patented a remarkable tool. Dmitri is very inventive and a hard worker. Because of my hectic schedule Dmitri always makes sure the house is clean and that lunch and dinner are prepared for me. Dmitri has taken the responsibility of the home on his shoulders. Dmitri encouraged me to go back to school so that I could sit for the CPA exam, and again to law school. During all this time Dmitri has been there for me emotionally and spiritually. This is the man who held my hand before and after surgery, who listened to me rant and rave when our Blazer was stolen, who has held me when I've been sick. To the Immigration Laws of the United States Dmitri is just a "moral turpitude criminal" - to me he's my husband and heart.

How many men do you know that would go to Arizona to work on a construction project not knowing or caring if they were going to get paid. Dmitri did this in June of 1995 when the temperatures were 100-110 degrees. Why? He thought my parents might need additional help.

Dmitri is strong willed and very proud and I believe this coupled my income and his cultural background may have been responsible for his shoplifting. I know that he believes very deeply that it is his responsibility to be the "man of the house" which means it's his responsibility to be the bread winner. Yes it's a cliche, but he did not grow up in the United States, Dmitri grew up in Russia where the culture is different. During the early years of our marriage I believe Dmitri felt he wasn't living up to his responsibilities as a husband as defined by the Russian culture. I did not agree with him and I have slowly succeeded in educating him in the American way. Each day we spend together he adapts more and more to the American way overriding the cultural heritage of Russia. After thirteen years of marriage Dmitri is "Americanized."

Dmitri and I have been married since February 1994 and this is certainly not where we expected be. Due to Dmitri's behavioral problems I face the serious threat of losing my husband, best friend and partner. While I cannot excuse Dmitri's theft offenses, I do know that according to the psychiatrist, there were psychological reasons for his actions. Dmitri has received therapy and I feel that he will not commit any more offenses nor has he since 1998. I agree that the INS has the right to deport people from the United States, however, I don't feel that the punishment in my husband's case fits the crime. I believe that I can see both sides of the situation, but it does not seem to be in balance. Dmitri is truly trying to help himself. I feel that the United States is better off with Dmitri than in sending him away and destroying two lives.

I respectfully ask that you consider my feelings and life, as well as Dmitri's. Jail time and fines are all punishments that fit his crimes. Sending Dmitri to a country where his life will be in danger and forcing us to choose between separating and going to live in another country together is not really an option. This is the hardest thing I have faced and I am pleading for my husband. Thank you for considering my words.

I declare under a penalty of perjury that the foregoing is true and correct.

Dated: 10-31-07                                         *Patricia Lynn Jacks-Tatarinov*
                                                        Patricia Lynn Jacks-Tatarinov

**HUNTLEY PAIN SPECIALISTS**
**MICHAEL J. HUNTLEY, M.D.**
JASON S. GRAEME, PA-C
7592 Metropolitan Drive, Suite 404
San Diego, CA  92108
Telephone:  (619) 325-1161 * FAX:  (619) 325-1717

## PROGRESS SUMMARY

PATIENT'S NAME:              TATARINOV, DIMITRI
DATE OF SERVICE:             02/28/2007

ANESTHESIOLOGIST:            Michael J. Huntley, M.D.

**HISTORY:**
Mr. Tatarinov has been a member of our pain clinic since his initial evaluation that took place on September 18, 2003.  He was referred to our office at that time by his primary care physician, James Novak, M.D. and neurosurgeon, Richard Ostrup, M.D.  At that time, Dr. Ostrup had recommended that the patient undergo a series of lumbar epidural steroid injections to treat his lumbar degenerative disk disease causing a longstanding history of low back pain.  At that time, an MRI of the lumbar spine revealed degenerative disk disease at L3-L4 and L4-L5 with a moderately large right paramedian disk protrusion at L4-L5 with severe thecal sac and right L5 nerve root compression.  There was also evidence of mild-to-moderate left posterior disk bulge at L3-L4 with thecal sac compression near the left L4 nerve root.  At that time, his chief complaints were low back and left lower extremity pain and at that time he could not recall any acute event or injury to have precipitated this condition.  There have been repeat MRI scans completed showing continued multilevel lumbar degenerative disk disease with disk protrusions again at the L3-L4, L4-L5 and L5-S1 levels.

Mr. Tatarinov has elected to continue treating this condition in a conservative manner having in the past utilized physical therapy, medication management and use of interventional pain management procedures to include lumbar epidural steroid injections and a lumbar selective nerve root/transforaminal infections to treat his chronic low back and bilateral lower extremity pain.  He does have history of having both right and left leg pain in addition to his low back pain.  Since his initial evaluation with our office on September 18, 2003, he has undergone approximately 18 interventional pain management procedures again comprised of lumbar epidural and/or selective nerve root injections to his lumbar spine.  These procedures when done on an occasional basis have allowed him to continue functioning in the higher level of activity, and have also allowed him to reduce his need of any oral pain medications.

Given his history and his radiographic findings, it is unlikely that aggressive treatment utilizing lumbar surgery would provide him with significant relief of his symptoms.  He would most likely eventually have to undergo multilevel lumbar fusion with poor prognosis.  However, by continuing to treat his pain in this fashion utilizing occasional fluoroscopically guided injections allowing for reduced inflammation in his lumbar spine, he is able to have periods of relief.  The patient would like to continue treating conservatively in this fashion and we agree that this is more than reasonable.

If Mr. Tatarinov did not have access to continue treatment for his low back problems that he would most likely come to a point where the inflammation in his lumbar spine would be more increased and his pain

Page Two
RE:   DIMITRI TATARINOV
February 28, 2007

would be more intolerable.  Unfortunately, if this would recur, he would most likely find himself on more potent long acting pain medications and with a significantly reduced level of activity and difficulty in taking care of his own independent activities of daily living.

With his current treatment, his prognosis for higher level of functioning over the next many years would be seen as good, and without his current treatment regimen or should he have surgical intervention we feel the prognosis would be poor to fair at best.  The only other treatment that is possible and not yet discussed would be dorsal column stimulation.  This is again, however, conservative, but could provide a significant amount of relief should it be a successful treatment for Mr. Tatarinov.

/Accutype 032777B2_1
D:  02/28/2007
T:  03/01/2007

_____
Jason S. Graeme, PA-C for

_____
Michael J. Huntley, M.D.
Diplomate, American Board of Anesthesiology
Board Certification in Pain Management
State of California Qualified Medical Examiner

DATE/TIME: 3/1/2007

JEROME P. WALLINGFORD
ATTORNEY AT LAW
P.O. BOX 501108
SAN DIEGO, CA 92150-1108
TEL. (858) 484-2387

October 15, 2004

To Whom It May Concern:

RE: Dmitri Tatarinov

Mr. Tatarinov was defrauded of his right to appeal the robbery conviction he suffered in San Diego Superior Court case number SCD119330 by attorney Vladimir Verhovskoy, California Bar No. 94039. Attorney Verhovskoy represented Mr. Tatarinov at the trial of that case, and was then retained to handle the appeal. In 1997, Verhovskoy failed to file the opening brief and caused the appeal to be dismissed. Verhovskoy hid the fact of that dismissal from Mr. Tatarinov by lying to him about the status of the appeal. Mr. Tatarinov finally learned about the dismissal during 1999 when a family member made her own inquiry to the court. Verhovskoy made a perfunctory effort to have the dismissal set aside. When that was denied, he continued to lie to Mr. Tatarinov about the lack of other available remedies. Verhovskoy continued to represent Mr. Tatarinov on an immigration matter. Verhovskoy ceased to represent Mr. Tatarinov in December 2000, when the California State Bar suspended Verhovskoy's license to practice law.

During the period of time that Verhovskoy represented Mr. Tatarinov, the attorney exploited the relationship he had with his client. Mr. Tatarinov placed an unusual amount of trust in the attorney because of their shared Russian heritage. Verhovskoy, like Mr. Tatarinov, is a Russian national, fluent in the Russian language. Although Verhovskoy provided shoddy legal representation, he was able to keep Mr. Tatarinov as a paying client by taking advantage of his client's unwavering trust.

Mr. Tatarinov retained me in 2001 in an effort to revive the dismissed appeal. From 2001 through September 2004, I litigated the case from the California Court of Appeal, through the California Supreme Court, then into the United States District Court and the Ninth Circuit Court of Appeal. In spite of the substandard representation Mr. Tatarinov had received from Attorney Verhovskoy, those courts were not willing to revive the dismissed appeal, citing the passage of several years between the dismissal and the efforts to revive the case. In my opinion, those courts failed to recognize the level of undue influence that Attorney Verhovskoy had exercised over Mr. Tatarinov during those years.

To Whom It May Concern:
RE: Dmitri Tatarinov
October 15, 2004
Page 2

---

It is extremely disappointing to me personally that Mr. Tatarinov has not been allowed to litigate issues that could have been presented on an appeal from the robbery conviction. The case was, in reality, a shoplifting incident. Mr. Tatarinov had a legal defense to the robbery charge. Unfortunately, due to the neglect of Attorney Verhovskoy during trial, the jury was not instructed on that defense. Therefore, the jurors did not consider his defense in reaching their verdict. In my opinion, failure to instruct the jury concerning Mr. Tatarinov's defense would have been a meritorious appellate issue. Had the case been properly tried, it would have been resolved at the misdemeanor level. The robbery conviction is the result of a miscarriage of justice.

If you have questions or desire further information, please contact me.

Very truly yours,

*Jerome P. Wallingford*
Jerome P. Wallingford

-6-

121

# *Roy Resnikoff, M.D.*

family psychiatry

March 27, 2000

Immigration Court
San Diego, CA

Re:   DMITRI TATARINOV

This letter is intended as an update on Mr. Tatarinov's treatment in this office.

Mr. Tatarinov has been seen on a regular basis since August 17, 1998. Although the treatment has been primarily individually oriented, he has been seen on several occasions with his wife, Patricia.

Mr. Tatarinov has made good progress. He continues to work with his perfectionistic personality and overly high standards for himself and others. He is extremely reliable in his work as a mechanic at Sea World and is very reliable regarding health and financial issues in his marriage. Although there are still adjustments to the American culture, Mr. Tatarinov has become integrated, more and more.

The therapy has served as an outlet for pent up frustrations stemming from overly high standards. There has been no recurrence of the impulsivity that characterized the previous shoplifting incidents.

I believe that Mr. Tatarinov should be able to stay in the United States.

Sincerely

Roy Resnikoff, M.D.

7852 Eads Avenue
La Jolla
California
92037
858/ 454-1650

Fax 619/ 454-0692

Diplomate of the
American Board of
Psychiatry and Neurology

Diplomate of the
American Board of
Adolescent Psychiatry

Clinical Professor
of Psychiatry, UCSD